UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Hon. Joseph H. Rodriguez |
| | : | |
| | : | Criminal No. 20-543 |
| v. | : | |
| | : | OPINION |
| HANIEFF TRUSTY | : | |

Defendant, Hanieff Trusty ("Trusty"), was charged in Camden County Superior Court with possession of heroin/cocaine, possession of controlled dangerous substance ("CDS"), two counts of distribution of heroin/cocaine, possession of a weapon while committing a CDS crime, possession of a handgun, certain persons not to have a weapon, and possession of large capacity ammo magazine. Based on these charges, the United States Attorney for the District of New Jersey sought and obtained an Indictment charging Mr. Trusty with possession of a weapon as a convicted felon, in violation of 18 U.S.C. § 922(g)(1), and possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1)(C). Presently before the Court is Mr. Trusty's omnibus motion seeking, *inter alia[1]*, to suppress the evidence of a gun and drugs seized from him during the motor vehicle stop in violation of The Fourth Amendment to the U.S. Constitution. U.S. Const. amend. IV.

The charges at issue resulted from a K-9 Officer search of a rental vehicle operated by Trusty on January 14, 2020.  In short, Trusty was pulled over in the Waterfront Section of Camden, New Jersey by Camden County Police Officer Robles and

---

[1] Defendant also moves to file additional motions based upon new information.  The Government does not oppose this motion and it will, therefore, be granted.  In addition, the Government seeks reciprocal discovery and that motion will be granted.

a search of the vehicle yielded a firearm and CDS. Mr. Trusty seeks to suppress the evidence of the search. First, he argues that the traffic stop was not justified under any circumstances, including an investigative stop and/or for traffic violations. Trusty denies that he committed any traffic code violations preceding the stop. Second, even if the stop was lawful for traffic violations, the traffic stop was impermissibly extended in violation of *Rodriguez v. United States*, 135 S. Ct. 1609, 1612 (2015). Trusty argues the officers prolonged the stop unnecessarily by looking into Trusty's background before pursuing their ordinary permissible traffic related inquiries, including the validation of license, registration, and warrant checks, which customarily take approximately ten minutes. For either of these reasons, Trusty argues that because the traffic stop was unconstitutional, any evidence recovered during the stop, including the narcotics and gun, must be suppressed under the fruit of the poisonous tree doctrine. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963).

The Government argues that Robles: 1. Lawfully stopped Trusty to conduct an investigative detention based on the officer's reasonable and particularized suspicion that Trusty was engaged in drug trafficking; and/or 2. Robles lawfully stopped the defendant based on Robles's reasonable suspicion that the defendant had committed traffic violations, after he personally witnessed the defendant commit multiple motor vehicle infractions in his presence. Further, to the extent that the Court finds that the traffic violation stop was supported by a reasonable suspicion, the Government argues that there was no undue or impermissible delay during the traffic stop and the stop of the defendant and the course of the stop remain lawful under *Rodriguez* and its progeny.

The Court has considered the written submissions of the parties and the testimony and arguments presented at the hearing on March 16, 2023.  For the reasons expressed on the record that day, as well as those set forth below, the Motion to Suppress will be denied.

## I.     Factual Background

There are several sources of information that inform the facts this case. First, Officer Edwin Robles ("Robles") was wearing a Body-Worn Camera ("BWC") during the events at issue.  The BWC provides contemporaneous video and audio of the events on January 14, 2020.  Robles also authored a report on January 19, 2020 and then testified at the hearing in this matter on March 16, 2023 where he was subject to cross-examination.  In general terms, the timeline of the facts regarding the motor vehicle stop once the BWC is activated are not in dispute. *See* body camera footage from Officer Edwin Robles, #672, entitled "Ex. A-1 Robles 10-38_Carl_Miller_Master_P" on thumb drive attached as Ex. A. In addition to the video footage, the Government supplied a transcript of the audio captured by Robles' BWC and the video was presented during the hearing with testimony from Robles at various points.[2]

The audio and visual depictions provide a critical timeline which inform the justification for and constitutionality of the traffic stop and help pinpoint whether the traffic stop was unconstitutionally prolonged so that an investigatory stop could be performed. Given the contemporaneous nature of the video and audio, the Court will recount the facts and use the video and audio transcript timestamps as a guide of the

---

[2] The facts and exhibits admitted into the record at the hearing on March 16, 2023 include the BWC and the transcript of the hearing.

events leading up to the search and Trusty's arrest.  From this perspective, the relevant information is as follows.

A. The Traffic Stop

On January 14, 2020, at approximately 9:53 a.m., Trusty was driving a legally rented motor vehicle near his home in Camden when he was pulled over by Robles, who was in uniform while he was operating a marked police car.  When Robles approached the vehicle, he informed Trusty that he pulled him over because Trusty was avoiding police contact and was driving fast.  Later, Robles' BWC captures Robles telling others on the scene that he observed Trusty's vehicle driving through drugs sets to distribute CDS and "when I tried to get behind him, he took off." (Ex. J, p. 12).

Robles' report and testimony during the hearing in this matter provide additional details related to the basis for the traffic stop.  Robles states he was assigned as patrol in the Waterfront South area of Camden and directed to investigate, thwart, and deter drug trafficking and violent crime. (Ex. Q, Mark43 Computer Aided Dispatch "CAD" Report, pp. 1, 7; Ex. R, Transcript of 3/16/23 Suppression Hearing, pp. 22-23).  He performed that same patrol assignment on several dates, including between January 12 and 14, 2020.  During these patrols, he observed a black 2020 Chevrolet Suburban with tinted windows and an out-of-state (Illinois) license plate driving through well-known drug sets[3] in his assigned patrol area on multiple occasions. (Ex. J pp. 13, 14, 18) (Ex. R p. 29,

---

[3] Trusty takes issue with Robles' qualifications that the streets of the Waterfront South area of Camden where he saw Trusty's vehicle were "well known drug sets[.]"  Trusty argues that the Government failed to offer evidence of this categorization that would support calling the area as "high crime." *See United States v. Wright*, 485 F.3d 45, 53-54 (1st Cir. 2007) (formulating a three-part framework including temporal proximity between evidence of heightened criminal activity and the date of the stop or search at issue). Trusty contends that without such evidence the Court may not take judicial notice of that designation. *See* Fed.R.Evid. 201(b). This argument discounts Robles' testimony regarding his personal experience in this area, including CDS and firearm related searches and arrests. In addition, Robles' training and experience

4

168-171). Robles recounts that he saw the Suburban repeatedly driving through the drug sets located at the 1800 block of Filmore Street, the 1900 block of Filmore Street, and at Webster and Holcaine Streets. (Ex. A, p. 2; Ex. B, p. 4; Ex. C, Transcript of Officer Robles' BWC Video, pp. 1-2, 9, 13, 14, 18; Ex. D, CSI photographs of the Suburban).

Robles testified that, on multiple occasions during this patrol, when the driver of the Suburban noticed his marked-car surveillance the Suburban responded by driving away at a fast pace, but not speeding.  Robles qualifies this responsive behavior as consistent with an individual who was intentionally avoiding law enforcement contact. As an example, Robles states that he pulled up directly behind the Suburban on Filmore Street, and the Suburban pulled away from him at a fast pace on Filmore Street, in a manner to put distance between them. (Ex. A, p. 2; Ex. C, pp. 1, 4, 12-13, 18).  Robles' observations, including the erratic conduct of the driver of the Suburban as well as the vehicle's presence at well-known drug sets, provide his basis for his reasonable belief that the driver of the Suburban had been involved in drug trafficking. (Ex. A, p. 2).

Robles' report states that he observed the Suburban commit stop-sign and turn-signal infractions at Broadway and Webster Streets. (Ex. A, p. 2). He claims that when the driver realized his traffic infractions and then noticed the patrol vehicle he again drove away at a fast pace. (*Id.*) Robles activated his over-head lights and then pulled the Suburban over at Carl Miller Boulevard and Masters Streets. (*Id.*)[4]

---

inform this categorization of a high-crime neighborhood "known for a lot of shootings, drugs, and prostitution." (Exhibit R, p. 21- 23). The Court finds that there is sufficient evidence that the streets identified by Robles in that area are known drug-sets.

[4] Trusty disputes several facts and argues that Robles used his BWC to capture his embellished statements justifying and rehabilitating the reasons for his search and the traffic stop, including whether (1) Robles had pulled behind the Suburban at various points on January 14, 2020, and the prior days, but the Suburban drove in a manner to evaded him, (2) observed any individuals approaching the Suburban and

In the meantime, Robles activated his BWC and his patrol car comes to a complete stop.[5] Robles entered the license plate number into his computer to identify the registered owner of the vehicle and to ensure that the vehicle was registered and insured. The entry produced no results. While Officer Robles was attempting to verify the Suburban's license plate number using the "InfoCop" program, he also requested back-up units for assistance over the radio. Robles states that the back-up units were marshaled as a safety precaution because Robles could not discern the number of people inside the vehicle and because he observed the driver moving around inside the Suburban in a manner consistent with someone trying to conceal something inside the vehicle. (Ex. A, p. 1, Ex. C, pp. 1, 3, 4, 13). The Court finds Robles' testimony and report regarding the movement credible.[6]

---

speaking with the driver, (3) observed the Suburban committing traffic offenses, and (4) observed a right arm reaching to hide something in the back seat when he pulled over the Suburban.

[5] The length of the traffic stop informs the parties' arguments and the Court's analysis of whether the stop violates *Rodriguez v. United States*, 135 S. Ct. 1609, 1612 (2015) and its progeny. The parties have centered their arguments on the timestamp beginning with the activation of Robles's BWC, which occurred when Robles activated his over-head lights to initiate the traffic stop. The record reflects that Robles placed his vehicle into "park" approximately 23 seconds after the BWC was activated. From this point, the timeline flows.

[6] Trusty contends that Robles' description of the car moving once it was pulled over is a self-serving and evolving embellishment. When Robles called in the stop, he informed the dispatcher that the whole car is moving: "the passenger is moving around, I don't know if he's trying to conceal something." (Ex. J, p. 1). He also supported his request for back-up and the K-9 stating, "cause he was moving around, and I don't know what he was trying to hide in the car." (Ex. J, p. 2). He also justified his suspicion that a weapon was in the car by on the BWC: "Cause the thing is, to . . . get your credentials. You're not gonna, the whole car, the whole car's not going to move." (Ex. J, p. 4).

Robles' report contains more detail about the movement including that he "observed the driver lift up his/her right arm and place something in the backseat of the vehicle." (Ex. S, pg. 2). At the hearing, Robles explained the movement by stating that he observed an individual's arm move "as if they were putting something in the rear right passenger seat." (Ex. R, pg. 61). Robles further explained that he thought the person was attempting to hide something because the car "wouldn't move like that to gather basic information from the car." (Ex. R, p. 51). But Robles stopped there and did not testify about seeing the driver's right arm or the rear passenger seat on the body camera video. (Ex. R, pp. 123-24). And he admitted that he did not give these details to the other officers who arrived on the scene. (Ex. R, pp. 125-26).

Trusty also claims that Robles' statement regarding the number of potential passengers in the car is likewise suspect. On cross examination, Robles blamed the window tint for his inability to discern the number of passengers and whether the movement he observed came from a potential passenger or the

Two additional Camden County Police Officers, Giancarlo Lewis and Anthony Roderiguez, arrived on the scene in about two minutes time. (Ex. A, p. 2; Ex. C, p. 1). After Robles debriefed Lewis and Roderiguez, all three officers approached the Suburban.  There is no dispute that the officers believed, at this point, that the driver was the sole occupant of the vehicle.  Trusty is asked to lower the window. Then Robles informs Trusty why he has been pulled over, including that he observed Trusty avoiding police contact, constantly driving through well-known drug sets, and had sped away from him on Filmore Street when Trusty noticed the marked police car had pulled up behind him. (*Id.*).

Trusty provides his driver's license and a copy of the rental agreement. At this point, approximately 3 minutes and 2 seconds have passed since the BWC activation. (*Id.*). Robles returns to his patrol vehicle to process the documents and types Trusty's names into the "Mark43 CAD" program on his computer and the program produces Trusty's profile in about 50 seconds.  The generated profile included a "Universal Precaution" alert at the top of the screen and a list of prior law enforcement contacts with Trusty. Robles informed Roderiguez of the "Universal Precaution," and then asks Roderiguez to seek the nature of the prior police contacts and obtain consent to search the vehicle. Robles also tells Roderiguez that he was going to call for a K9 officer to

---

driver. (Ex. R, pp. 153, 155).  He continued to convey the movement and possibility that someone in the car was concealing a weapon to convey safety precautions to his fellow officers. (Ex. R, p. 157).

Finally, Trusty claims the officers' discussions during the search of the vehicle served to justify their suspicions. Once the contraband and weapon were found behind the front seat, Robles offered "That's why he moved." Roderiguez agreed: "Yeah, he probably ditched that sh&* right there. He probably had it on him, and put it back there." Ramos agreed "That's why he was like 'I'm not giving you guys consent.'" (Ex. J, p. 10). Explaining the events to his Sergeant, Officer Robles commented: "And I guess that's why the car moved, and he probably placed the firearm in the back." (Ex. J, p. 14); (*see also* Ex. J, p. 19 (similar discussion between Robles and Roderiguez)). Robles' testimony is credible in this regard and consistent with his pronouncements on his BWC.

conduct a sniff of the vehicle because he observed Trusty moving around the vehicle in a manner consistent with someone trying to hide something or place it out of view.  (Ex. A, p. 3; Ex. C, p. 2).

Officer Roderiguez approached the Suburban and interacted with Trusty. Approximately 5 minutes and 49 seconds after the BWC activation, Roderiguez returned to Robles and informed him that Trusty refused to offer information relating to the nature of his prior arrest, that Trusty denied that there was anything illegal inside the Suburban, and that he refused to consent to a search of his vehicle. (Ex. C, p. 2).  In the meantime, Robles examined the rental agreement for the Suburban and noted that Trusty paid $756 to rent it.  Robles then directed Roderiguez to request a narcotics K9 officer to conduct a sniff of the Suburban, and at approximately 6 minutes and 45 seconds after the BWC activation, Roderiguez radioed the dispatch operator and requested a narcotics K9 officer.  (Ex. A, p. 3; Ex. B, p. 6; Ex. C, ps. 2-3).

Robles continued to read the results from the Mark43 CAD entry and discerned that a few of Trusty's prior law enforcement contacts came in the Centerville area of Camden. (Ex. C, p. 3). Within the next minute, several things happen. The K9 Officer is dispatched at approximately 7 minutes and 40 seconds after the BWC was activated. (Ex. A, p. 3; Ex. B, p. 6; Ex. C, p. 3). Between approximately 8 minutes and 2 seconds and 8 minutes and 48 seconds after the BWC was activated, Robles radioed communications and solicited a warrant and driver's license check for Trusty's driver's license number. During this communication, Robles also tells Roderiguez that his attempts to run the Suburban license plate number were unsuccessful and did not produce any results. (Ex. C, p. 3).

Almost three more minutes pass and at approximately 11 minutes and 57 seconds after the BWC activation, communications respond with validation of Trusty's driver's license and confirmation that he is not the subject of any active warrants. (Ex. A, p. 3; Ex. B, p. 6; Ex. C, p. 4). Several seconds later, Roderiguez is heard stating his belief that Trusty himself applied the tint to the windows of the Suburban because he saw the tinting materials in the back seat of the Suburban. (Ex. C, p. 4). While they wait for the arrival of the K9, Roderiguez suggests that Robles continue to investigate whether Trusty is a notable offender. Robles's search of his email does not produce any information, but Robles verbalizes that Trusty's name is "familiar." At this point, almost 17 minutes have passed. (Ex. C, pp. 4-5). Robles continues his search by contacting the Real Time-Tactical Operational Intelligence Center ("RT-TOIC"); RT-TOIC informs Robles that Trusty is a "notable offender" at timestamp 19 minutes and 42 seconds. (Ex. A, p. 3; Ex. C, p. 5).

During this time, Roderiguez' own email search produced confirmation that Trusty had a tag as part of a "24 Hour Intelligence Summary" because he was "an Iraq gang member, gun offender, and is thought to be involved in CDS distribution throughout the city." At approximately 19 minutes and 45 seconds Roderiguez relayed that information to Robles. (Ex. C, pp. 5-6; Ex. E, 1/14/20 Email from Officer Roderiguez to Officer Robles and Redacted 24-Hour Intelligence Summary for 11/20/19).

### B. The Search of the Vehicle and Mr. Trusty

K9 Officer Recon and Officer Wilberto Ramos arrive on the scene at the 21-minute time stamp. (Ex. B, p. 6). Almost a minute passes before Robles ordered Trusty

to exit the Suburban.  Trusty refuses at first and nearly another minute passes before Trusty complies with the directive.  At this point, almost 23 minutes have passed.

Then, Robles handcuffed Trusty to perform a *Terry* frisk but did not find any weapons. Roderiguez noticed two bulges in Trusty's pockets, Robles believed the bulges were large wads of cash. (Ex. A, p. 3; Ex. C, pp. 6-8).

K9 Recon conducted an exterior sniff search and alerted the presence of narcotics at the 25 minute 8 second mark. (Ex. A, p. 3; Ex. C, p. 8). The narcotics alert gave Robles and Roderiguez probable cause to search the Suburban; heroin and cocaine were discovered at the 27 minutes and 35 second mark.  Both substances were located above the driver's side window visor in a manner consistent with packaging for distribution. Cash was discovered in the car's console and a loaded handgun, with 14 total rounds and one round in the chamber was discovered in the pocket affixed to the rear of the front passenger seat. (Ex. A, p. 3; Ex. B, pp. 5-6; Ex. C, p. 8).  According to Robles, the cash in Trusty's pockets was bundled in a manner consistent with drug proceeds and confiscated by Officer Lewis.  A total of $3,440 cash was seized from the Trusty's pockets and vehicle. (Ex. A, p. 3).

It took over an hour for the registration of the vehicle to be confirmed by communications and that information was relayed at 10:55 am.  By this point, a little over an hour had passed and Robles had already begun transporting Trusty to the Detective Bureau for processing. (Ex. B, p. 4). Ultimately, state authorities charged Trusty with several drug trafficking and firearm possession offenses. In addition, traffic summonses were being issued to the defendant for failure to stop, failure to signal a turn, and possession of controlled dangerous substances in a vehicle. (Ex. A, p. 3). The

United States Attorney's Office adopted this matter for federal prosecution, and on June 24, 2020, a federal Grand Jury sitting in Camden returned a two-count Indictment charging Mr. Trusty with possession with intent to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), and possession of a firearm by a previously convicted felon, in violation of 18 U.S.C. §922(g)(1). This omnibus motion followed.

## II. Standard of Review

The Fourth Amendment to the U.S. Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. To prevail on a motion to suppress, a defendant generally bears the burden of proving that the challenged search or seizure was unreasonable under the Fourth Amendment. *See United States v. Acosta*, 965 F.2d 1248, 1257 n.9 (3d Cir. 1992) ("The proponent of a motion to suppress has the burden of establishing that his Fourth Amendment rights were violated."). However, once the defendant has established a basis for his motion, *i.e.*, that the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).

The police may stop a car and briefly detain it and its occupants to investigate a reasonable suspicion that such persons are involved in criminal activity if the stop is reasonably related in scope to the circumstances which justified the stop. *Terry v. Ohio,* 392 U.S. 1 (1968). Although the reasonable suspicion requirement is a "less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence," it nonetheless requires an officer to articulate an "objective justification for making the stop." *Illinois v. Wardlow,* 528 U.S. 119, 123

(2000) (citing *United States v. Sokolow,* 490 U.S. 1, 7 (1989)). As such, "an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation." *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003).

The Supreme Court has held that a dog sniff of a car *during* a lawful traffic stop does not violate the Fourth Amendment. *Illinois v. Caballes,* 543 U.S. 405, 410 (2005). *See also Indianapolis v. Edmond,* 531 U.S. 32, 40 (2000) (A dog sniff of the exterior of a car is "much less intrusive than a typical search") (quotation omitted). Further, the Court rejected the argument that, while executing the stop in a reasonable manner, the shift in purpose from a lawful traffic stop into a drug investigation was unlawful because it was not supported by any reasonable suspicion. *Caballes,* 543 U.S. at 408. Rather, the Court upheld the trial judge's determination that a dog sniff was sufficiently reliable to establish probable cause to make a complete search of the trunk of the car. *Id.* at 409. The Third Circuit has acknowledged as much. "It is . . . well-established that, looking at the totality of the circumstances, a dog's positive alert while sniffing the exterior of the car provides an officer with the probable cause necessary to search [the interior of] the car without a warrant. *United States v. Pierce*, 622 F.3d 209, 213 (3d Cir. 2010) (citing *Karnes v. Skrutski,* 62 F.3d 485, 498 (3d Cir. 1995) ("[I]t is clear that the drug dog's alert would present probable cause for a search."); *United States v. Massac,* 867 F.2d 174, 176 (3d Cir. 1989) ("When the alert was given by the dog, we are satisfied that, at least when combined with the other known circumstances, probable cause existed to arrest.").

However, "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Rodriguez v. United States*, 135 S. Ct. 1609, 1612 (2015) (quoting *Caballes*, 543 U.S. at 407). Ordinary inquiries incident to a traffic stop includes "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 1615 (emphasis added). Reasonable suspicion of criminal activity may also justify detaining an individual beyond completion of the traffic infraction investigation for a dog sniff.  *Id.* Where the officer had reasonable suspicion of criminal activity, the Third Circuit upheld expanding an initial traffic stop to affect a K-9 search held ten minutes after the defendant would have been free to leave the traffic stop; the entire stop took 55 minutes. *United States v. Robinson*, 529 Fed. Appx. 134 (3d Cir. 2013); *see also United States v. Leal*, 235 Fed. Appx. 937 (3d Cir. 2007) (upholding K-9 search delayed by 80 minutes); *United States v. Frost*, 999 F.2d 737, 740-42 (3d Cir. 1993) (same).

In simpler terms, a lawful traffic stop that is subsequently lengthened by "off-mission" tasks unrelated to the traffic stop can become unconstitutional if the lengthening is not supported by reasonable suspicion. *United States v. Green*, 897 F.3d 173, 178-79 (3d Cir. 2018).  While police may investigate matters unrelated to the traffic stop that do not lengthen the roadside detention without infringing the rights of the driver, any unrelated investigation that serves to "measurably extend the duration of the stop," becomes unlawful unless it is supported by reasonable suspicion. *Johnson*, 555

U.S. at 333. As a result, a lawful motor vehicle stop "ends when tasks tied to the traffic infraction are – or reasonably should have been – completed." *Rodriguez*, 575 U.S. at 354.

### III.    Findings

Defendant Trusty challenges Robles' basis for his reasonable suspicion to conduct an investigatory stop. He also mounts two challenges to the traffic violation stop: 1. That the traffic stop lacked probable cause, and 2. That even if probable cause existed to conduct the traffic stop, the stop was unlawfully prolonged beyond the reasonable time needed to issue a traffic violation.

As to the unconstitutional lengthening of the stop, Trusty claims that the nearly 24-minute stop was unlawful because the police officers prolonged the stop by researching Trusty's background using the CAD entry system, email communications, and by radioing communications to run background checks. Trusty claims this took place before Robles conducted the permissible inquiries relating to license, registration, and warrant checks. What should have been an ordinary inquiry took over ten minutes and then the stop was further prolonged by Robles' and Roderiguez' interrogation of Trusty about his criminal history. Trusty argues that the interrogation regarding his criminal history was irrelevant to the traffic stop and that any evidence obtained as a result must be suppressed. The Court will address the issues, in turn.

### A. Investigative Detention and Search

The Court finds that Robles had a reasonable suspicion that the driver of the Suburban was engaged in drug trafficking based upon his observations of the Suburban

over the course of several days, including on January 14, 2020 and the days prior, his prior training and experience of investigating drug related crime in that specific area of Camden, his knowledge of the use of rental cars and tinted windows to frustrate law enforcement, and the driving patterns of individual's seeking to evade interaction. The investigative stop was justified on this basis.

The Court agrees with the Government and finds that Robles had a particularized, articulable, and objective basis for suspecting that the driver of the Suburban was engaged in drug trafficking at the time of the motor vehicle stop.

At the time of the stop, Robles informs Trusty of his belief that Trusty was evading him, driving in a manner to avoid police contact, and that Trusty was observed driving through well-known drug sets. (Ex. A, p. 3, Ex. C, p. 1). When Robles approached the vehicle and engaged Trusty, the following exchange occurred between the two:

> ROBLES: Roll the back windows down. Roll the back window down. All the way down.
> TRUSTY: What's going on?
> ROBLES: [….] I pulled you over because earlier you tried to avoid police contact, you were driving fast down Fillmore, all right?
> TRUSTY: You said I'm trying to avoid police contact?
> ROBLES: Yeah. You were driving through Fillmore, I got behind you, and you took off. Alright?
> TRUSTY: I, I never. You ain't tried to pull me over.
> ROBLES: Yes, I did.
> TRUSTY: How?
> ROBLES: And you're constantly driving through well-known drug sets. Alright? Whose vehicle is this?
> TRUSTY: Were your lights on?
> ROBLES: Whose vehicle is this?
> TRUSTY: This is a rental.
> ROBLES: Alright. And who does the vehicle belong to?
> TRUSTY: What do you mean? It belongs to me.
> ROBLES: It's in your name?
> TRUSTY: Yeah, paperwork is right here. Hanieff Trusty, this is my license
> ROBLES: Alright, give me a second.

(Ex. J, pp. 1-2).

Here, Trusty's Suburban vehicle stood out because it is a newer model of a very large sport utility vehicle, which Robles testified is uncommon to see in those neighborhood areas of Camden. (Ex. R, 25-26).  In addition, the windows were heavily tinted, which is a feature consistent with Robles's experience and awareness that drug dealers frequently use tinted windows to evade law enforcement detection. (*Id.*). Given its massive size and Illinois tags, Robles had little difficulty identifying it as the same vehicle and driver he had personally observed driving through the drug sets on the day of the arrest and two days prior thereto.[7]  The Court finds that the State of Illinois license plate tags in particular are characteristic of a rental car and undermine Trusty's argument that there is strong likelihood of an innocent explanation undergirding the circumstances of his driving behavior and posture during the stop.  Robles testified to his awareness that drug dealers frequently drove rental vehicles to shield their financial assets from forfeiture. (Ex. R, 27).

When determining whether evidence adds up to reasonable suspicion, this Court must evaluate probative factors and those factors "susceptible to innocent explanation" to decide whether, taken together, "they suffice[] to form a particularized and objective basis" for making the stop. *United States v. Arvizu*, 534 U.S. 266, 277 (2002).  On this basis, Trusty argues that taken separately, each facts fails to support a reasonable suspicion and that the Government is favoring quantity over quality of facts.  *United*

---

[7] Robles believed that the driver of the Suburban on the day or and days prior to Trusty's arrest was the same person and consistent with Trusty's physique. Robles described the driver of the vehicle as having a "[h]eavy build" and noted that he "was a big guy[.]" (Ex. R, pp. 36, 143-44). At the time of his arrest, Trusty's body mass index number was consistent with that observation.

*States v. Rodriguez-Escalera*, 884 F.3d 661, 668 (7th Cir. 2018) (finding a district court "need not accept all of an officer's proffered justifications at face value … [and] as fact-finder is entitled to weigh the evidence presented at a suppression hearing"). For these reasons, Trusty contends that there was an insufficient reasonable suspicion for the initial investigative stop.[8] The Court disagrees.

Robles also testified at the hearing that when he witnessed the Suburban driving through the drug sets on January 14, 2020 and the days prior, the Suburban engaged in similar driving patterns and on several occasions stopped to interact with people on the street. He did not see any physical contact during these stops, he only witnessed verbal exchanges and stated that once the individuals noticed Robles' marked patrol car, they walked. (Ex. R, pp. 25-26). Robles acknowledged at the hearing these facts are not detailed in his report or his present in his verbal summaries to other officers as they arrived on the scene.[9] (Ex. R, pp. 108, 116-17). It is at the hearing that Robles first detailed witnessing the Suburban stopping in a manner consistent with a drug-

---

[8] In his post-hearing brief Trusty argues that once Robles had his driver's license, Robles became aware that Trusty resided in the area.  Trusty argues that this serves to pierce Robles's suspicion that Trusty was in the area to traffic drugs.  Moreover, given that Mr. Trusty is a larger man, he argues Robles should have understood his preference for driving through the neighborhood rather than walking. Def. Brief, p. 25 [Dkt. No. 71]. Trusty also alleges that using the socio-economic argument that a high-end car in a low-income neighborhood is indicative of criminal activity has been categorized as systematic bias, especially in the sentencing context.  *See United States v. Berry*, 553 F.3d 273, 280, 285 (3d Cir. 2009) ("[R]eliance on arrest records may also exacerbate sentencing disparities arising from economic, social and/or racial factors," suggesting that "officers in affluent neighborhoods may be very reluctant to arrest someone for behavior that would readily cause an officer in the proverbial 'high crime' neighborhood to make an arrest."); *see also United States v. Mateo-Medina*, 845 F.3d 546, 552-53 (3d Cir. 2017) (looking at studies on arrest data and concluding that a "record of a prior arrest may, therefore, be as suggestive of a defendant's demographics as his/her potential for recidivism or his/her past criminality").  On these bases, Trusty argues that Robles' assigned patrol of a high crime area should not inform is opinion that a driver of a high-end vehicle should be investigated and searched.

[9] There is some tension between Robles' testimony and the facts memorialized in his report. Robles explained his failure to include this information in his reports as an oversight because "I was just rushing through it." (Ex. R, p. 146). Robles also conceded on re-direct examination that the fact that individuals were "approaching" the Suburban was not an important factor considered when he pulled over the Suburban. (Ex. R, pp. 150, 175).

trafficking case manager.  The Court credits this testimony because of his demeanor on

the witness stand, but also in large measure because this testimony comports with the

exchange between Robles and Rodriguez captured on the Robles' BWC

contemporaneous with Trusty's arrest:

> Robles: After this, I'm going to go stop that Spanish guy too.
> Roderiguez: Hmm?
> Robles: I'm going to go stop the Spanish guy.

(Ex. J, pp. 3-4).

The Spanish guy refers to an individual Robles testified he observed approaching the

Suburban during its drive throughout the known drug-sets. Robles explained how drug

sets work and that a case manager will "obtain the currency from individuals who are

out there selling CDS and pick up the money." (Ex. R, p. 25).  Case managers also

resupply the area with CDS.  This activity usually takes place in the morning hours,

which is a consistent timeframe to Robles's witnessing of Trusty's driving patterns.

Given that a "case manager" will usually re-supplying the sets with narcotics and collect

drug proceeds from the dealers during the early morning hours, Robles was suspicious

of the vehicle's driving patterns. (Ex. R, p. 25). Robles' suspicion was further bolstered

by the fact that the windows were heavily tinted, as well as his awareness that drug

dealers frequently drove vehicles with heavily tinted windows to evade law enforcement

detection. Robles also testified that when the Suburban noticed his marked police

vehicle, the Suburban drove away at a heightened pace.  During one such interaction,

the driver of the vehicle quickly parked the Suburban on Webster and walked into a

home near the drug set.  The Court credits Robles' testimony that this evidence is

consistent with an individual who was intentionally avoiding law enforcement contact

because he or she was drug trafficking and rejects Mr. Trusty's argument that he rented the vehicle and then applied extra tint to the windows simply for ease of travel.  (Ex. R, pp. 37-39).

For these reasons, the Court finds that Robles acted on a reasonable suspicion that the defendant was engaged in drug trafficking and that the search of Mr. Trusty's vehicle is constitutional.  The motion to suppress is denied.

B. The Traffic Violation Stop

The Court further finds that the traffic stop was lawful because Robles witnessed multiple traffic violations when he saw the Suburban fail to stop at a stop sign at Broadway and Webster Street, and when he saw the Suburban make a left turn without using a turn signal. Robles issued multiple motor vehicle violations, including for failure to stop at a stop sign and failure to signal a turn, and detailed the violations in his police report. (Ex. A, p.3). Robles also testified during the hearing in this matter and the Court counts his testimony as reliable and credible.

Trusty argues that Robles did not tell him about the motor vehicle violations when Robles spoke to Trusty after the traffic stop and questions Robles' credibility on this point.  While it is true that Robles did not identify the motor vehicle violations as a basis for the stop when he first spoke to Trusty (*see* p. 15, *infra.)*, that omission is not dispositive and does not undermine Robles' credibility as to the multiple bases for the stop.  Trusty provides no authority to support the proposition that the police officer must indicate every infraction or basis for a lawful traffic stop during the initial colloquy of the driver.  Failure to do so may later serve to undermine confidence in the veracity of

the police officer's account, but it does not invalidate the reason for the stop, even if that reason is pretextual.[10]

Upon review of the extensive record and witnessing Robles' character on the witness stand and given the totality of the circumstances, including the experience and training of Officer Robles, the Court finds that there is a sufficient basis for the traffic stop grounded in motor vehicle violations observed during Robles' surveillance of the area and observation of the Suburban that day.  Robles' reasonable suspicion that a traffic violation has occurred justifies the stop. *United States v. Green*, 897 F.3d 173, 178 (3d Cir. 2018) (probable cause not necessary to initiate a traffic stop; a reasonable suspicion provides a lawful basis. (citation omitted); *Lewis*, 672 F.3d at 237 (3d Cir. 2012).

Even if the reasons Robles expressed to Trusty were/are pretextual, the stop traffic stop is constitutional. Traffic stops require only reasonable suspicion, not probable cause. *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012). "[T]he Supreme Court [has] established a bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is merely a pretext for an investigation of some other crime." *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) (citing *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)).

In this regard, the present matter is akin to the facts in *United States v. Wilson*, 960 F.3d 136, 144–45 (3d Cir. 2020), where the driver, Wilson, was pulled over for traffic violations.  During the traffic stop, the officer engaged Wilson and learned that the vehicle was a rental.  The officer asked him to step outside.  There were two other

---

[10] During the hearing, Robles stated that the traffic violations were not "main reason" he pulled Trusty over. (Ex. R, p. 158). His primary reason was to investigate the Suburban driving through drug sets.

passengers in the vehicle and as Wilson exited, the officer noticed that there was no luggage in the back hatch of the vehicle.

The driver's and vehicle information were given to dispatch and the officer engaged Wilson about the traffic violations. Wilson volunteered that he was driving from Philadelphia to Georgia for a funeral and was tired. The officer continued to check in with dispatch to check on the status of the information related to the traffic stop and learned that Wilson's name was not on the rental agreement and the vehicle had been rented for one month.

When the officer engaged the passengers, they gave a different story about their reason for travelling to Georgia. They volunteered that they were staying in Georgia for a week prompting the officer to question their lack of luggage. They replied they intended to buy what they needed. Wilson also volunteered that he had a juvenile drug arrest. At this point, the officer confronted Wilson with his suspicions that he and the passengers were lying and asked Wilson how much cash was in the car. After a pause, Wilson admitted that they had approximately $20,000.

All of this happened in less than ten minutes and dispatch still had not delivered the information regarding Wilson and the vehicle. The Third Circuit found that, at this juncture, the traffic stop was still justified for traffic enforcement and not impermissibly prolonged in violation of *Rodriguez*, 135 S. Ct. at 1614–15. The court noted that during this time, the police officer learned of facts to establish a reasonable suspicion of drug trafficking.

> By then, Freeman had learned more than enough to establish reasonable, articulable suspicion that the three men were trafficking drugs: They were driving through North Carolina in a rental car they had picked up the day

before in Philadelphia, but the person named in the rental agreement was not in the car. They said they were going to Georgia for a week, but the car was rented for a month and they had no luggage. They gave conflicting stories about their trip's purpose. And Wilson confessed to having a lot of cash in the car. Especially given Freeman's extensive experience interdicting drugs, his suspicion was objectively reasonable. *See United States v. Arvizu*, 534 U.S. 266, 273–74, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). Thus, by the time Freeman extended the stop to investigate other crimes, he had more than enough evidence "to establish reasonable suspicion that [the passengers] w[ere] involved in drug trafficking." *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018) (citing *Rodriguez*, 135 S. Ct. at 1615).

*Wilson*, 960 F.3d at 146.

Like Robles, the police officer in *Wilson* testified at a suppression hearing regarding the traffic violations he witnessed and the court credited this testimony. *Wilson*, 960 F.3d at 145. Here, Robles' credible testimony extends not only to the basis for the stop, but also to the facts learned in the days before the stop and his observations during the time he initiated the traffic stop, as set forth *infra*. Moreover, the delay in obtaining the identifying information about the Suburban rental vehicle was not caused by or promoted by Robles, as in *Wilson*, 960 F.3d at 146. The record reflects that police communications did not confirm the validity of the Trusty's driver's license and whether any outstanding warrants were active until almost 12 minutes after the activation of the BWC. The registration did not come back for over an hour.

Applying the time frame in *Wilson* and observing that pinpointing a *Rodriguez* moment[11] is often difficult, the traffic- violation stop of Trusty's vehicle remained permissible for traffic enforcement for at least the first twelve minutes following

---

[11] Recognizing the difficulty of pinpointing the Rodriguez moment, the Third Circuit "suggested that, in appropriate cases, district courts might sidestep the difficult task of pinpointing the actual Rodriguez moment by simply assuming the defendant's proposed earliest potential Rodriguez moment." *United States v. Wilburn*, No. 2:18-CR-115, 2021 WL 1310423, at *25 (W.D. Pa. Apr. 8, 2021) (citing *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018)).

activation of the BWC.  As Robles had not heard back from dispatch with information about Trusty and the registration of the rental car, the stop was still justified for traffic enforcement. *See Rodriguez*, 135 S. Ct. at 1614–15.  The Court finds that the mission of the traffic stop was not fully carried out before the discovery of evidence giving rise to a reasonable suspicion of criminality. *See United States v. Hurtt*, 31 F.4th 152, 159 (3d Cir. 2022).

The evidence supports the Government's arguments and the Court finds that Robles had the following information in his possession before the license validation and warrant checks came back near the twelve-minute mark:

1) His repeated observation of the Suburban driving through three drug sets at the 1800 block of Filmore Street, the 1900 block of Filmore Street, and at Webster and Holcaine Streets;
2) His repeated observation of the Suburban stopping and appearing to speak to individuals during his drive through of the three drug sets in a manner consistent with a drug trafficking case manager;
3) knowledge that the Suburban is a higher-end vehicle not usually seen in that area of Camden;
4) The heavy tint on the windows of the Suburban is consistent with drug trafficking to evade law enforcement;
5) The Suburban had out of State license plate, consistent with a rental vehicle which is often used by drug traffickers.  Trusty confirmed that the vehicle was a rental when he produced his license and the vehicle documents;
6) That the driver of the Suburban reacted to Robles' presence of a marked police car by driving away at a fast pace to evade police interaction;
7) Robles observed this behavior when Trusty quickly parked the car on Webster Street and "ran" into a house[12];

---

[12] Robles testified that Trusty was trying to elude him by driving at a heightened pace and on one occasion, when Trusty parked the car and ran into a home on the right side of Webster Street. (Ex J, p. 37).

> A. Because as I was approaching the vehicle, the individual parked at a fast rate, exited and went right inside of the residence.
> Q. So what was your purpose of parking your car on Broadway?
> A. Waiting to see if the vehicle would exit back out of Webster.
> Q. Okay. And why were you waiting to see if it exited? What

8) Once the Suburban was pulled over, Robles witnessed someone inside the Suburban reach their arm towards the back of the rear passenger seat, consistent with a person concealing something in the vehicle. The car also shifted consistent with this movement;

9) Robles ran a standard Mark43 CAD inquiry, a search employed in all motor vehicle stops. That search revealed that Trusty's profile contained a "Universal Precaution" alert at the top of the screen and a contained a list of multiple prior law enforcement contacts;

10) Trusty refused to discuss his prior arrests when asked by Officer Roderiguez.

The Court finds that these facts support the reasonable suspicion to extend the traffic stop and transition to an investigative detention. *Givan*, 320 F.3d at 458. Accordingly, the search and seizure were reasonable under the Fourth Amendment. Mr. Trusty's motion to suppress the drugs and firearm will be denied.

IV.    Conclusion

For the reasons set forth herein, Defendant Hanieff Trusty's Motion to Suppress is denied. Defendant's Motion seeking permission to file additional motions is granted and Defendant shall submit reciprocal discover to the Government. An appropriate Order shall issue.

Dated: April 26, 2024

_____
HONORABLE JOSEPH H. RODRIGUEZ
United States District Judge

---

did you want to do?
A. To do a vehicle stop.
Q. Okay. And why did you want to do a vehicle stop?
A. To further investigate what I observed prior in the day.
Q. Okay. And what would that be?
A. CDS activity.

(*Id.* at p. 38).